Case number 20-1013. Aircraft Service International, Inc. doing business as Menzies Aviation et al. Petitioners v. Federal Energy Regulatory Commission and United States of America. Mr. Field for the petitioners, Ms. Berry for the respondents, Ms. Hoff for the interviewers. All right, good morning, Mr. Field. We'll hear from you. Thank you, Your Honor. May please the Court. In the proceedings below, FERC found movements of jet fuel that undeniably originate outside of Florida and terminate within Florida to nevertheless be interstate movements because the product enters a terminal at Tampa, Florida before continuing on to its ultimate destination at Orlando. A century of precedent construing the Interstate Commerce Act dictates that the jurisdiction of a multi-part movement such as this is determined by whether the shipper of the product has a fixed and persisting intention to move product through the terminal storage to its ultimate destination. FERC explicitly found that the airlines in this case have an overarching intent to move jet fuel from out-of-state sources to the Orlando airport and furthermore that they execute this intent in the most efficient and economically practical way. But not only did FERC not conclude that the airlines then have the necessary fixed and persisting intention, but it found that these facts do not address the jurisdictional question of the transportation over Central Florida pipeline. It reached this inexplicable result only by ignoring the rich precedent left by the Supreme Court, the Interstate Commerce Commission, and its own decisions and then correctly and myopically applying a mechanistic three-factor test. FERC's critical error appears in paragraph 122 of its order. In rejecting the relevance of its own finding of overarching intent, FERC states that the airlines accomplish their overarching intent to supply their planes at Orlando through two distinct movements. First, a foreign interstate movement to the Tampa terminal and an intrastate movement from the terminal to the to the airport by pipeline or truck. The question however is not whether this movement occurs in two purposes. And the findings by FERC on the record undeniably demonstrate that there is no purpose behind either of these movements other than to move jet fuel to Orlando from out-of-state sources. But Mr. Field, isn't part of the purpose as you said to create an efficient and economical way of moving this? So there is some other intent besides just moving it to Orlando. There is you know an intent to do this in a particular way by storing fuel at Tampa before it goes on to Orlando. There's two responses to that. The first is that the intent is to move the product to Orlando efficiently and that intent is carried out. As far as storage at Tampa, there's no evidence that there's an intent to store product at Tampa in this case. The fuel is not needed at Tampa and in fact it's essentially impossible to store the fuel at Tampa because of the volume that moves through every month. Doesn't it stay in Tampa sometimes for a long period of time up to 12 days? The fuel moves through Tampa continuously. It sometimes takes 10 to 12 days to move through the product. No council 10 to 12 days in the tanks is not continuous movement and here's my question about your overarching intent. If that were a proper interpretation of the statute, wouldn't all the cases such as Atlantic be decided differently? If that was, isn't it the real question whether there's continuous movement or not? And it's an objective test that determines so-called intent. It causes a little confusion here but use the word intent. But the key is whether there's continuous movement or not. To the question of continuous movement, there's no case that holds that the fact that product stops during its movement defeats the continuity of movement. That's the case from the Supreme Court. What about Atlantic? Atlantic Coast really highlights what the difference is between a continuous movement and one that's conducted in two legs. Atlantic Coast found that the entire purpose of bringing the product to the terminal storage was for Standard Oil to conduct a marketing and distribution business out of that terminal. It then delivered product to 127 different locations and it did that based on needs of customers that might arise and that were not planned before the product was brought into the terminal. But there still was an overarching intent to get the gasoline to the stations, right? Overarching intent was to run a marketing and distribution business out of the seaside storage. Am I wrong? Wasn't there an overarching intent to get the gasoline to the stations? There was not a primary intent to get the gasoline to the station. The intent was to bring it to storage so that there would be enough product in the seaboard storage that when need product to those other stations. Isn't that how this works here as well? Fuel is sent to the Orlando airport as the different airlines need it. Isn't that part of what FERC found? Yes, and it's also ordered based on what the airlines need. It's all driven by what the airlines need at Orlando. If they look at how much fuel they need at Orlando in a month, they order that amount of fuel to come to Orlando that month. It can only move through as fast as product is being consumed because there's already fuel at Orlando. It's a constant process. This has been going on for decades where you've got planes flying out of Orlando consuming fuel. As they consume a day's worth of fuel, a day's worth of fuel can come in. It's just a cyclical process. And of course, it has to come to Orlando. There's no other way to get it onto the pipeline. Well, of course, if the fuel was shipped immediately to a connecting pipeline and then onto a pipeline to Orlando, then you would have a different case. The problem is, did you have a sufficient stop in Tampa to break the continuity? All the Norville factors run against you. You don't deny that. I do deny that the Norville factors run against us. The question that is present throughout all precedent here is whether there's intent to move the product through the terminal to the ultimate destination. No matter how long it stops at the terminal? Certainly, 10 days has not been shown to disrupt the transportation. There was one to 30 days in Sabine. In Department of Defense versus Interstate Storage, it could be stored up for two months. If you look in Northville, there is a system where the product was stored for months on end in off-peak periods. And the entire intent was to store product at the terminal so that it could be used months later during peak periods. Those factors just aren't present here. What our case has in common with all the other cases finding transportation jurisdictional is that the product was ordered specifically for use at an inland destination. The product moved through the terminal. There was never any question that the product would not move through the terminal. There's no other business occurring at the terminal. There's no sales there. There's no marketers that operate out of the terminal. There's no distribution business operating out of the terminal. Wait a minute. There was distribution out of the terminal. What about 10% of the fuel is sent not to Tampa, but to other locations in Florida? First of all, there's two airlines that only moved the product to Orlando that never moved to other airports. Second of all, any product that's delivered to another airport was ordered for use at that specific airport. In the record, the initial decision looked at the nominations that Delta submits. This is in paragraph 127 of the initial decision. It sets forth the particular volumes for each of the airports it supplies from Hooker's Point. It sends a nomination that says, I want this much at Orlando, this much at this airport, this much at this airport. That's where that fuel ends up. Counselor, what about my question? Isn't it true that a certain amount of fuel was sent from the Tampa terminals to other locations, not Orlando? Yes. It's sent to those airports that those airlines, for instance, Delta ordered the product. So Tampa constitutes a distribution location as well as a transshipment location to Orlando. There's no precedent that any party in this court that finds an analogous situation a distribution point. My ask of the presiding judge, is there something wrong with our system here? Does counsel not hear my question? I believe everything is, the audio is working. Mr. Field, if a judge asks you a question, you should stop speaking and let the judge have the floor. All right. So Judge Silberman, why don't you ask your question? Well, now I can't remember the question. So it'll come back to me. I believe, I believe you guys. Excuse me, have you argued here before? No, your honor, I have not. Well, it is de rigueur that when a judge asks you a question, you stop. And I must say I was, because of our new technology, I was confused as to whether my voice was even coming across because typically when a judge asks a question, experienced counsel will stop talking. I apologize, your honor. I did not hear that your question was coming while I was trying to answer your question. The question I thought I was answering was whether a product goes to destinations other than Orlando. And what's the answer? The answer is that it does go to destinations other than Orlando because it's ordered by those airlines for their consumption at those destinations. The process is exactly the same. And if you look at the Delta nominations that were detailed in the initial decision, the nomination specifies specific quantities to go to the different airports. And so from the time it's ordered, it's always known that that product, that quantity of product is going to that particular airport. That's just a separate mode of transportation from the product that's going to Orlando. What's ordered from Orlando goes over the pipeline to Orlando. What's ordered for the other locations goes from the ship into the terminal to those other locations. It's the same process. Counsel, what is the point you were making that the normal factors don't apply? No, not the argument that normal factors should not be used exclusively, but your previous argument that under the normal factors you should prevail. Why do you say that? Which one of the normal factors points in your direction? The first normal factor is whether there's a specific order for a specific quantity of product to move through the terminal destination. As I just explained, the airlines nominate specific amounts of jet fuel every month. They nominate based on what they plan to move through. Isn't that only an estimate, a rough estimate? It doesn't coincide exactly. It's not specific. It's an estimate based on the airline's anticipated needs, and those estimates prove to be pretty accurate over time. FERC has never before found that you need some sort of exact 100% match between the order and what actually comes through. In Carson Petroleum, there was a 10% discount. There's numerous cases coming out of the ICC where there's some difference between the amount that was ordered and that ultimately came through, but there was no question that those were still specific orders. You think the first factor in normal is satisfied because there's a specific order for specific amounts to be sent specifically to Orlando? Is that your view? Yes, Your Honor, it is. On the second factor, the question is whether there's a marketing and distribution business in the traditional commercial sense going on at Tampa. Now, I don't know what other type of marketing distribution business that they're looking at, but we know that there's not one in the commercial sense, and there's no marketers that operate out of Tampa. There's no general distributors of product that operate there. Everything that comes to Tampa is brought to Tampa because it was ordered by an airline for use at an airport, and the product goes to the airport that the airline ordered it for, and it goes in a short period of time, much less time than it takes product to move through in other cases in which FERC has found the transportation jurisdictional. FERC states that the recurring pattern of shipments here are irrelevant. It says that in its brief. The recurring patterns of shipments show that you've got this constant flow of fuel coming through Tampa to define destinations that it was ordered for and where it's consumed. Each airline has a specific intent to bring jet fuel from out-of-state sources to Orlando over the pipeline to fuel its planes at Orlando. What about the third factor? The third factor goes to whether arrangements have been made for the transportation beforehand, and there's a great deal of record evidence on this point, most of which FERC just decided to not go to that factor. The judge herself stated that she looked only at the arrangements from the tanks to the terminal and not at the general scheme, but the general scheme shows that these arrangements have been made in advance. The airlines formed a LLC that engaged in a group and deficiency agreement with the terminal that requires them to put the product that comes into Tampa onto the CFPL pipeline. Every month, aircraft service submits a nomination to the pipeline detailing what's going to come in that month and what will go over the pipeline. There's simply no question that the arrangements have been made. The product is going to come into the amounts that were ordered. You can just see this by the fact that this is what happens. Every month, the product comes in and it moves through just as it's intended. There's no sense in which something else happens. To argue, as FERC did, that the arrangements haven't been made simply because there was no nomination to the pipeline that said, I'm having 100 barrels come off vessel A and I want it to go on the pipeline on Thursday. That's something that's not practical to do commercially. It's not something that's been done and it's not something that happened in cases like Sabine or Carson where product came to the terminal and it was stored there until a vessel came that could take it away. That's a natural feature of the commercial transportation and the Supreme Court precedent is clear that you're not supposed to let these practicalities obscure the fact that there's an overall intent to move product through the terminal rather than to keep it at the terminal for some distinct purpose other than moving it through to the final destination. Judge Soberman, Judge Raul, do you have further questions? No, boss. No. All right. Thank you, Mr. Field. We'll give you some time on rebuttal. I believe next we are to hear from Ms. Perry on behalf of the commission. May it please the court, Lona Perry for the commission. I would like to address the Northville factors that were under discussion at the end of the petitioner's argument. And I would like to point out the commission's findings based on substantial evidence that each of these factors were in fact met in this case. To begin with the first factor, the first factor is that at the time of shipment there is no specific order being filled for a specific quantity to be moved beyond terminal storage to the final destination. As was recognized previously, that means sent to Orlando in this case. And it is correct, first of all, that the commission, the administrative law judge and the commission found that these nominations that the petitioner was discussing were estimates. But in addition to that, there is a reason why the petitioner was referring you only to Delta's nominations. In the first place, the administrative law judge found that three of the airlines who put nominations to their marine suppliers only identify Tampa as the delivery point. And that's in the initial decision at paragraph 191. So three of the airlines don't even specify any point of delivery past Tampa. So there can't be, by definition, any specific order for delivery past Tampa with those airlines. The other two airlines, Delta, which he was just discussing, and Southwest, do in their nominations specify points beyond the terminal storage. But the administrative law judge found with respect to that, both of those shippers are shippers on both of those airlines purchased from Valero. And Valero loads its ships in foreign ports prior to receiving the nominations from the airlines. And you can find this at paragraph 178 of the initial decision. And because of that, there is no way that the marine supplier is loading its ships based on any specific order that is coming from either Delta or Southwest with regard to those amounts. But Ms. Perry, when Delta or Southwest make that nomination, they know that the fuel will be traveling, you know, interstate or internationally in that case. I mean, so they're aware of that when they make that nomination. No, Your Honor, it needs to be at the time of shipment, there is a specific order to the shipper. The marine supplier is the shipper in this instance with regard to the first element. So it is not a question of whether the airlines know that ultimately this fuel is going to go to the regional airports or to Orlando. The question is, what does the marine shipper know? And the marine shipper does not know because the vessel is loaded before the nominations are received where any of this fuel is ultimately going to be delivered. And so that's why there is no satisfaction of the first Northville factor. The second Northville factor, the character of the storage, the commission found in the first Northville itself, and like that, an interstate energy was used for the purpose of inventory and storage. Specifically, if you look at paragraph 159 of the commission's order, the commission finds and affirms the administrative law judge's finding that there was direct evidence of airlines intent to follow the recommended inventory by aircraft services, which was to maintain a 20-day fuel supply that was split between Tampa and Orlando. And that that was the purpose for the delay, paragraph 146 of the order, delay at Tampa was attributable to the desire of the airlines to maintain a 20-day fuel supply for transportation. In addition to that, the commission also found and affirmed the administrative law judge's findings that in addition to the facts of Northville and interstate in which the using it for inventory was sufficient for purposes of interrupting the continuity of travel, there are additional facts here which further support the finding that the continuity of travel was interrupted. That includes that it was a distribution point, which is there was distribution to between the regional airports and Orlando once the fuel is received in Tampa. Furthermore, there's distribution among the airlines because shipments from Chevron are not allocated among the airlines until they are delivered in Tampa and aircraft services makes that allocation. And in addition to that, the airlines treat the fuel that is received in Tampa as being a fungible pool that can be shared among the airlines as necessary. Specifically, the administrative law judge and commission pointed to negative inventory where airlines are permitted to borrow from the accounts of other airlines if they are running short of fuel supply at the end of month. And the commission found that this was actually a common occurrence. And if you look at the initial decision at paragraph 285, they list how often three of the of the airlines use this frequently, and they list how many days during the relevant time period that happens. Miss Perry, can I ask you maybe a little bit different question that I was trying to get at if FERC finds that there has been an interstate shipment, is FERC required under the ICA to set just in reasonable rates? I mean, I guess another way of putting that is, is FERC's jurisdiction mandatory for interstate shipments? Or is there any discretion for FERC to decline jurisdiction to set rates? I don't know that there's a ground on which the commission could decline jurisdiction, if it were a jurisdictional pipeline. I, I... Because the ICA is written in different terms from FERC's other statutes involving the setting of rates. And so I, I don't know, I'm, I'm just, I'm, I, I couldn't figure out the precise answer to that. So I was wondering what the agency's position was on whether they have discretion to decline jurisdiction under the ICA. I don't know of a commission answer to that, Your Honor. And certainly it didn't come up in this case because they found that the pipeline at issue was not jurisdictional. So I, I, I can't tell you what the commission's position on that would be, whether it would feel compelled to that jurisdiction did not exist in this case. It, it didn't come up. But it would bolster the agency's argument, right? That even if there was sort of a close case, you know, that they have discretion not to exercise jurisdiction, right? So if, if they have discretion, then, you know, they get a little more leeway maybe in, in close cases. I, I understand your point, Your Honor. I don't believe that the commission made any findings regarding its jurisdictional discretion in this case. They found that the Northville factors clearly all pointed towards there being no jurisdiction over this pipeline transportation and, and therefore it was not an issue. They did not regard it as being at the end of the day. No, I understand that. I just think it's a, it's a legal question that it seems in the agency should, should have a, an answer to, but, but I guess if it doesn't, that's, that's fine. What do you think about, what do you think about counsel's argument that he didn't have a chance to get to that Gutman recognized that the Norville factors were not adequate? That's he put it. What's your response to that? And therefore, therefore the main argument is that the FERC should understand the economic realities that the only way this fuel can be shipped to Tampa is the method they're using. I mean, that can be shipped to Orlando is the method they're using. Your Honor, Gutman did not in under any circumstances disavow the Northville factors. What Gutman found, and you can see that the commission talked about this in note 253 of its order. What the commission, what the commission found in Gutman was that the Northville factors, which they entirely recognized were commissioned precedent did not apply in that case was found to exist because there was no non-operational storage used. It was just pipeline to pipeline. It was just pipeline to pipeline, Your Honor. And they were trying to say that the junction between the two pipelines, the Chelsea junction, that that was a point of interruption that was sufficient to break the continuity. And the commission said that's not a break in continuity of transportation. And therefore the Northville factors don't apply. The Northville factors only apply where there is a break, where there is an interruption in the shipment and you apply the Northville factors to determine what the nature of that interruption is and whether it interrupts the continuity of transportation. The key argument that Petitioner raises in this case is the economic realities require the system that is used and that should be taken into account. Your Honor, the fact that they organized, as the commission found, you would expect them to organize their business in the most efficient way for purposes of, of supplying themselves with jet fuel. But the point is the way they have organized this transportation, it leads to an interruption in the continuity of transportation that is not for purposes of onward transportation, which is the difference between Carson Petroleum and Sabine, where the Supreme Court specifically held that the delay in transportation there was only for purposes of onward transportation. In this case, on the other hand, the commission specifically affirms the administrative law determination and the commission's finding is a paragraph 162 of its order that specifically affirmed the ALJ's determination that the Petitioners failed to show that they were moving the oil from, I mean the jet fuel, pardon me, from Tampa to Orlando as expeditiously as possible. They put in a supply chain model that purported to show that and the administrative law judge and the commission both rejected that model and found that they had failed to make a showing that it was going as expeditiously as possible. To the contrary, it was being held in Tampa for purposes other than its onward transportation to the Orlando airport. So, in other words, the commission's finding was that the existence of the interruption, that everybody is planning their deliveries as efficiently as possible. In Atlantic Coast, the deliveries were planned there presumably as efficiently as possible by Standard Oil, but the fact remained that the way their business was conducted, it was most efficient for them to hold the oil in storage until for later delivery to their bulk stations as opposed to sending it out by immediate continuity of transportation. As the Atlantic Coast described it, it was being held there for convenient distribution instead of being sent through the of transportation. And that's the distinction. The fact that they organize it as efficiently as possible, some efficient organizations result in there being a break in the continuity of transportation. And it's the continuous transportation, not the efficient organization, that is the jurisdictional issue. Seeing as you're over your time, Judge Silberman, I don't want to pre-terminate this if you had further questions or Judge Rowe. No, I don't have any questions. All right. Thank you, Ms. Perry. I believe next we have, on behalf of the intervenors, Ms. Hoff. Good morning. May it please the court. My name is Amy Hoff. I'm appearing this morning on behalf of the intervenors in support of FERC. Your Honors, I believe that the fundamental problem with the petitioner's argument is relatively simple. What the petitioners advocate is a complete departure from Supreme Court and Commission precedent. In order to adopt the jurisdictional test that the petitioners advocate, FERC would have had to reject the Supreme Court's decision in Atlantic and the FERC's own decision in Northfield Dock as wrongly decided. Why? Because the test that the petitioners advocate would require FERC to focus, as Mr. Field indicated, solely on the undisputed facts that locations within the state of Florida at the inland airport and that the airlines want and need this to happen in order to operate their aircraft. In other words, according to the petitioners, these facts alone are sufficient to require a finding that transportation on central Florida is an interstate commerce. But, Your Honors, this is not the test. Mr. Field spoke earlier of whether or not there's a fixed and persisting intent to move through storage to the ultimate destination, but that's not entirely accurate. The test is whether there is a fixed and persisting intent to make a single continuous movement in interstate commerce. Not whether there's an intent to ultimately get to the destination, but again, whether you do that in a single continuous movement. It's rather confusing, isn't it, counsel, to use the word intent? The real question is whether there's a continuous movement or not. Yes, Your Honor. These are objective factors. Yes, Your Honor. If you look back at all of the Supreme Court precedent, Atlantic, all of the earlier cases as well, and then go on to the commission's decision in Northfield Dock, an interstate energy, all of those cases, they do evaluate whether or not the shipper has a fixed and persisting intent to make the single continuous movement in interstate commerce. But in making that determination, the court always looks at the objective factors, all of the details and all of the facts surrounding transportation, which the court and the commission have referred to as the indicia or the manifestations of intent. So again, the court and the commission, they don't just look at where the product starts and where it ends up and did the shipper intend for it to get there, but they look specifically at how it got there and what happened at any intermediate port or point of storage. And then they look at, again, whether that was a single continuous movement or whether, for example, there was a break. Your Honor, I see that I'm out of time. Did you notice that you filed the only brief with the use of acronyms created for this case that are not commonly used contrary to our wishes? No, Your Honor, I was not aware that that was contrary to your wishes, and we do apologize for that. In our rules. Thank you, Your Honor. I will say that this was a case in which there was a heavy use of acronyms from beginning to end, and so we apologize and simply intended to add clarity. It doesn't add clarity for people who are not specialists in the industry, and administrative law cases are important for all administrative lawyers. So anyway, we hate acronyms that are made up for cases other than acronyms like FERC. Thank you, Your Honor. I see that I'm out of time. If there are there other additional questions? Judge Rao? Judge Silberman? No, sir. Thank you, Ms. Hoff. Thank you, Your Honor. Mr. Field, I know you were out of time, but we will give you two minutes for rebuttal. Thank you, Your Honor. I'd like to first start off with addressing the question of whether a temporary pause in transportation can dictate the jurisdiction. FERC itself recognized in the Texaco case that storage by itself is not an issue of an intrastate movement. The Settle case from the Supreme Court says that a pause in transportation does not break the continuity of transportation where there's a persisting intention of the shipper which was carried out. That's at page 74 of that case. The ICC and the Railroad Commission of Texas, or its Oil Field Haulers Association, says that if the halt in movement is a convenient intermediate step in the process of getting the goods to the final destination, they remain in commerce until the final destination is reached. Similarly, in the Iron and Steel Articles case, which we brought up on our brief on the exceptions but never addressed in this order, while there must be continuity of movement before the transportation is part of foreign commerce, such continuity is not interrupted by a temporary pause in the carriage of goods. The fact that this product stops in Tampa is not decisive in this case. The question is whether the product was ordered for the purpose of moving through Tampa to Orlando, and the undisputed evidence of this record clearly indicates that it was. Excuse me, counsel. May I ask a question? What is the amount of deference we owe to FERC's determination in this case? In this case, you do not owe deference to FERC because FERC has made a legal error, not just an error of the facts. We are not contesting, for the most part, the fact that they found on the record, but the agency's decision is not based on its exercise of judgment but on an erroneous view of the law. No deference is owed to the agency. And what's the erroneous view of the law? Actually, we do give deference to agency's determination of legal questions as well as factual questions. You're aware of that, aren't you? If it's a legal determination, we review it under whether it's arbitrary and capricious. If it's a statutory interpretation, we give deference to that too, but it's really not a statutory interpretation question. It's an application of the jurisdictional issue. Wouldn't we give deference to that? What legal error, in your judgment, we should not give deference to? Legal error that you should not give deference to is the decision to exclude evidence of Northville Criteria and that was based on the recurring pattern of shipments rather than a single shipment at one point in time. The recent Gutman case makes clear that where there's evidence of intention that a shipment will move forward, the application of the Northville Criteria is not necessary. FERC has specifically applied the Northville Criteria in a number of cases. We discussed those at pages 48 through 51 of our brief. The question is always, what is the intent behind the movement overall? Here, we have product being ordered specifically to go to an inland destination. When that's the legally for FERC to reject evidence such as the request for proposals that the airlines put out that specifically identify that they are soliciting product to move to the airports. It was inappropriate for FERC not to countenance evidence of the throughput and efficiency agreement that the airlines have set up that requires them to move product through Tampa to the terminal. It was inappropriate to exclude the evidence of the model that the airlines expert put on which FERC specifically excluded because it did not go to the Northville Criteria. Not because it thought that the model was wrong. Those are legal errors that were FERC applied too narrow of an interpretation of the task at hand. For those reasons, this court should vacate FERC's work. Thank you, Counselor. Further questions? Judge Raul? Judge Silverman? No. All right. Thank you. We will take the case under advisement.
judges: Wilkins, Rao, Silberman